IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) WILLIE MORGAN, | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| *versus* | § | |
| | § | |
| (2) VALLEY INSURANCE COMPANY, | § | CASE NO.  CIV-07-799D |
| (3) VALLEY INSURANCE GROUP, | § | |
| (4) TRINITY UNIVERSAL INSURANCE | § | |
| COMPANY AND | § | |
| (5) UNITRIN, INC., | § | |
| | § | |
| Defendants | § | |

## DEFENDANT'S SUPPLEMENTAL MOTION IN LIMINE [1]

TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE TIMOTHY D. DeGIUSTI:

DEFENDANT VALLEY INSURANCE COMPANY ("Valley") files this its Supplemental

Motion in Limine, and respectfully shows as follows:

Plaintiff's expert witness list identifies Diane Luther, and lists her proposed testimony as

"facts and circumstances regarding expert opinion." Further, Plaintiff's exhibit list identifies "report

of Diane Luther." (No. 202).  As such, based on the very recent October 20, 2009 deposition

testimony of Luther, it appears Plaintiff intends to introduce expert testimony and/or other direct

evidence related to 78 claim files and a chart comprised to summarize same, which chart is a

supplement to her previously disclosed expert opinion.  However, any evidence of Diane Luther's

("Luther") supplemental opinion should be excluded where it was not timely disclosed.

Argument and Authority – Luther's supplemental opinions must be automatically excluded.

---

[1] *See attached Exhibit "A" for Table of Timeline of Events and Deadlines*

1.    *The expert witness and report must be disclosed in writing during initial disclosures.*

If the witness is one retained or specially employed to provide expert testimony in the case, a written report must be submitted.  Fed. R. Civ. P. 26(a)(2)(B).  The report must provide a "complete statement of all opinions the witness will express and the basis and reasons for them," as well as "any exhibits that will be used to summarize or support them . . . ." Fed. R. Civ. P. 26(a)(2)(B)(i), (iii).

Plaintiff disclosed Luther's expert report on August 18, 2008.  The report indicated Luther might need more time to supplement her report.  Luther's report did not disclose any opinion based on 78 claim files or a chart – which provides the basis for, and is, Luther's later-formed supplemental opinion.

2.  *Discovery Deadlines/Expert Deadlines*

The Court's order entered July 18, 2008, extended the parties' deadline set by the Amended Scheduling Order for expert reports as follows: Plaintiff's final list of experts and reports due by August 20, 2008; and Defendants' final list of experts and reports due by September 3, 2008. Moreover, in October 2008, the Court extended the time to complete discovery until December 5, 2008. Finally, on July 2, 2009, the Court granted the parties' motion for a special trial setting, placing the matter on the Court's docket of November 9, 2009.  Pretrial submissions were due to be filed by the deadline of October 1, 2009.

3.    *Time to Supplement Expert Reports/Opinions*

As for the rules regarding supplementing disclosures of an expert witness, Federal Rule of Civil Procedure 26(e)(2) specifies, in pertinent part, that "the party's duty to supplement extends both to **information included in the report** and to **information given during the expert's deposition**.  Any additions or changes to this information must be disclosed by the time the party's

pretrial disclosures under Rule 26(a)(3) are due." As noted above, pre-trial submissions were due to be filed, as ordered by the Court, by October 1, 2009.

Even if the Court had not ordered a pre-trial submission deadline of October 1, 2009, the default pre-trial submission deadline, and therefore, the deadline to supplement the information included in the report and the information given during the expert's deposition, would have extended only to October 10, 2009. Obviously, Plaintiff has also not supplemented the information in the expert report or the information given during the expert's deposition by the earlier date of October 1, or by the more lenient date of October 10.

Without a timely supplemental disclosure, Defendant is stripped of its rights under Federal Rule of Civil Procedure 26(a)(3)(B) to serve and promptly file a list of objections, including one challenging the admissibility of materials identified in Rule 26(a)(3)(A)(iii) – that is, an identification of each document or other exhibit, **including summaries of other evidence** – separately identifying those items the party expects to offer and those it may offer if the need arises.

In fact, Plaintiff's expert witness (Luther) was deposed on October 20, 2009.[2] Luther admitted her expert report is dated August 18, 2008, which was submitted on time and prior to the Plaintiff's deadline to file its final list of experts and reports by August 20, 2008. *(See* Exhibit B – Luther Depo. at 9: 22-25). Luther confirms her report indicates she will need to supplement her opinions to finalize her conclusions once she has had the opportunity to complete her analysis. *(Id.* at 10:1-5). However, Luther testifies, and the record confirms, Luther's opinions have not been supplemented. *(Id.* at 10: 6-8). In fact, Luther explains that after discussing the possibility of supplementing her report, the conclusion was reached she would just "give you the rest of it today

---

[2] Excepts of Luther's deposition testimony are attached hereto as Exhibit B, are incorporated herein by reference, and are cited by page number and line number as follows: "Luther Depo at __ : __).

in my deposition." (*Id.* at 10: 9-14).

Luther testified that at the time of her original expert disclosure, she thought she would need to supplement her opinions in the event Plaintiff got something new or extra that she had not already been provided. (*Id.* at 11: 13-23). Since her August 2008 report, Luther testified she has reviewed multiple depositions. (*Id.* at 12: 1-21).

At the crux of this issue, however, is Luther's testimony regarding two meetings with Plaintiff's counsel – one on August 15, 2009 where she reviewed the 78 claim files, and one five-hour meeting on October 6, 2009 with Plaintiff's counsel to go over the summary of the 78 files. (*Id.* at 23: 20-24; 14: 2-22). Luther explained the she and four of Plaintiff's attorneys created a chart summarizing the 78 files, indicating what category applied to each file, and typed up a summary. (*Id.* at 15: 6-18; 70: 12-25; 71: 1-14).

Luther confirmed her knowledge that she is required to disclose all of her opinions in her report. (*Id.* at 61: 7-12). However, Luther testified the report does not contain all of her opinions in the case. (*Id.* at 63: 21-25; 64: 1-3). Specifically, Luther testified her report does not contain her "tally" and trends she observed in the 78 files, which she testified constitutes her supplemental opinion. (*Id.* at 64: 1-6). Further, Luther first came to this supplemental opinion when she reviewed the chart (which effectively compiled date from 78 files and sorted it into specific groups or columns) at the five-hour meeting on October 6. (*Id.* at 64: 7-14). Subsequently, Luther testified as to her supplemental opinions based on her review of the summary/chart of the 78 files. (*Id.* at 64: 24-25; 65: 1-25; 66: 1-11).

Despite having created the chart summary of the 78 files on October 6, 2009, Luther had possession of the files prior to the deadline to supplement her report (October 1, 2009), and in fact, had possession of them at the time of her original report (August 15, 2008). (*Id.* at 71: 15-18).

Luther testified that she was not aware of any reason other than she might get some additional files, and her schedule, that she could not have completed the chart over a year ago. (*Id*. at 75: 23-25; 76: 1-12).

### 4.    *Plaintiff is Precluded From Using the Information*

Pursuant to Fed. R. Civ. P. 37(c), if a party fails to provide information required by Rule 26(a), the party is not allowed to use that information at trial unless the failure was "substantially justified" or is "harmless." Fed. R. Civ. P. 37(c)(1); *Buxton v. Lil' Drug Store Products, Inc.,* 2007 WL 2254492, *7 (S.D. Miss. 2007) (failure to comply with the requirements of Rule 26(a) requires "automatic and mandatory" exclusion of the proffered expert opinion pursuant to Rules 26 and 37(c)(1) where the plaintiff cannot show that the violation was either "justified or harmless").

Furthermore, courts have routinely rejected untimely supplemental expert testimony where the opinions are based upon information available prior to the deadline for expert disclosures. *See, Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., Inc.,* 73 F.3d 546 (5th Cir.1996) (purpose of supplemental expert report is to supplement - not to extend the expert disclosure deadline); *Avance v. Kerr-McGee Chem. LLC,* 2006 WL 3484246, *7 (E.D. Tex. 2006) (excluding late-filed report where plaintiffs failed to demonstrate "substantial justification" why the revisions and new affidavits were filed after the expert deadline ..."); *Cleave v. Renal Care Grp., Inc.,* 2005 WL 1629750, *1 (N.D. Miss. 2005) (excluding supplemental expert affidavit produced in response to summary judgment motion where plaintiff failed to identify new information which would prompt new opinions); *Salgado v. Gen'l Motors Corp.,* 150 F.3d 735, 741-43 (7th Cir. 1998) (affirming exclusion of supplemental expert testimony based on untimely disclosure because opinions were based on information available prior to the deadline for service of initial reports); *Buxton v. Lil' Drug Store Products, Inc.,* 2007 WL 2254492, *7 (S.D. Miss.2007) (noting that the court was inclined to

exclude the supplemental affidavit of the plaintiff's expert on the ground that the opinions contained therein were "more than a mere supplementation of his prior opinions" and were "entirely new opinions").

In the instant case, Luther testified that she had the 78 claim files prior to the deadline to supplement her report with any supplemental opinions. (Exhibit B – Luther Depo. at 71: 15-18). She offers no testimony, and Plaintiff can supply no evidence, that the failure to supplement the report was substantially justified or harmless. In fact, Plaintiff had no other reason to *not* provide the opinions later formed based on the creation of the chart summarizing the 78 files already in Luther's possession at the time of her original expert report. Instead, Luther testified her schedule might have precluded her from reviewing those files (which took her and Plaintiff's counsel five hours to review and enter into a chart), or that she anticipated the potential for receiving additional files. (*Id.* at 75: 23-25; 76: 1-12).

Plaintiff cannot, therefore, show that his failure to comply with the requirements of Rule 26(a) was either justified or harmless. As such, Luther's supplemental opinions based on her October 6, 2009 review and summary of the 78 claim files must be automatically and mandatorily excluded.

WHEREFORE, PREMISES CONSIDERED, Defendant Valley Insurance Company respectfully requests that the Court enter an order excluding Plaintiff's testifying expert's supplemental opinions, the documents used to summarize the other evidence/the 78 claim files, and any evidence or testimony related thereto, and enter an Order prohibiting such testimony before the Jury in this cause and for such other and further relief to which Defendant may show itself to be justly entitled or will ever pray.

Respectfully submitted this 2nd day of November, 2009.

/s/ Randall G. Walters

Randall G. Walters (Texas Bar #20819480)
Walters, Balido & Crain
900 Jackson Street, Suite 600
Dallas, Texas  75202
Telephone:  (214) 749-4805
Facsimile:  (214) 760-1670
E-mail:       randy.walters@wbclawfirm.com

-AND-

Stefan Wenzel (OBA #15923)
Peter Erdoes (OBA #11298)
ATTORNEYS FOR DEFENDANTS
Peck, Erdoes & Wenzel, P.A.
21 East Main Street, Suite 101
Oklahoma City, Oklahoma 73104
Telephone:  (405) 232-3533
Facsimile:  (405) 232-8330
E-mail:       wenzellaw@coxinet.net

## CERTIFICATE OF SERVICE

I hereby certify that on November 2, 2009, I electronically filed the foregoing DEFENDANT'S SUPPLEMENTAL MOTION IN LIMINE with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

- **JEREMY CARTER**
  **JCARTER@GPHGLAW.COM**

- **TODD GOOLSBY**
  **TGOOLSBY@GPHGLAW.COM**

- **JAMES GIBBS**
  **JGIBBS@GPHGLAW.COM**

/s/ Randall G. Walters

# EXHIBIT A

*Timeline of Events and Deadlines*

| | |
|---|---|
| August 18, 2008 | Plaintiff disclosed Luther's expert report. |
| August 20, 2008 | Plaintiff's final list of experts and reports due |
| December 5, 2008 | Deadline to complete discovery (on extension) |
| January 14, 2009 | Reviewed certain additional deposition testimony |
| March 3, 2009 | Reviewed certain additional deposition testimony |
| August 15, 2009 | Meeting with Plaintiff's counsel to review 78 claim files |
| October 1, 2009 | Pre-trial submissions due, including supplementing information in report and information (FRCP 26(e)(2)) |
| October 6, 2009 | 5-Hour Meeting with Plaintiff's counsel, creating chart of 78 files, and creating supplemental opinions |
| October 10, 2009 | Default deadline under Rule 26(a)(3) for pre-trial disclosures and supplemental expert reports, in the event the Court had not set an earlier date, which it did (Oct. 1). |
| October 15, 2009 | Defendants' would-have-been deadline to serve and file a list of objections to the admissibility of materials, including summaries of other evidence Plaintiff expected to offer, had a supplemental report been timely filed. |
| October 20, 2009 | Defendants learn of Luther's chart of 78 files, and of supplemental opinions based on same. |
| November 2, 2009 | Pre-trial Conference |
| November 9, 2009 | Trial Docket Date |

# EXHIBIT B

1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE WESTERN DISTRICT OF OKLAHOMA

3  (1) WILLIE MORGAN,
        Plaintiff,

4
   vs.                              No. CIV-07-799

5
   (2) VALLEY INSURANCE COMPANY,
6  (3) VALLEY INSURANCE GROUP,
   (4) TRINITY UNIVERSAL INSURANCE
7  COMPANY AND
   (5) UNITRIN, INC.,
8       Defendants.

9

10        VIDEOTAPED DEPOSITION OF DIANE LUTHER
            TAKEN ON BEHALF OF THE DEFENDANTS
11    ON OCTOBER 20, 2009, BEGINNING AT 10:07 A.M.
              IN OKLAHOMA CITY, OKLAHOMA

12

13               APPEARANCES:

14  Appearing on behalf of the PLAINTIFF:

15  David E. Proctor

16  GOOLSBY, PROCTOR, HEEFNER & GIBBS, P.C.

17  701 North Broadway, Suite 400

18  Oklahoma City, Oklahoma 73102-6006

19  (405) 524-2400

20  dproctor@gphglaw.com

21

22

23     (Appearances continued on the following page.)

24  VIDEOTAPED BY:  Cooper Rayburn

25  REPORTED BY:  Lacy Antle, CSR, RPR

2

1    (Appearances continued:)

2    Appearing on behalf of the DEFENDANTS:

3

4    Randall G. Walters

5    WALTERS, BALIDO & CRAIN

6    900 Jackson Street

7    Founders Square, Suite 600

8    Dallas, Texas 75202

9    (214) 749-4805

10   randy.walters@wbclawfirm.com

11

12   Appearing on behalf of the DEFENDANTS:

13

14   Stefan Wenzel

15   PECK, ERDOES & WENZEL

16   21 East Main Street, Suite 101

17   Oklahoma City, Oklahoma 73104

18   (405) 232-3533

19   wenzellaw@coxinet.net

20

21

22

23

24

25

3

1                            CONTENTS

2                                                    PAGE

3   Direct Examination by Mr. Walters            5

4

5

6

7                            EXHIBITS

8   Exhibit                                      Page

9   1  Ms. Luther's File                          7

10  2  Curriculum Vitae & Case List              134

11  3  Chart                                     123

12

13

14

15

16

17

18

19

20

21

22

23

24

25

9

1      All right.  Have you made any notes, or

2  highlights, or anything like that in these documents

3  that are upstairs in this box?

4      A    No, I don't believe so.

5      Q    Looking at Exhibit Number 1, as I

6  understand it, it is a -- it does have your time

7  sheet in there; correct?

8      A    Yes.

9      Q    And could I take a look at it --

10     A    Sure.

11     Q    -- please?

12         And then on the left here is kind of the

13  handwritten portion, then I notice at the back here

14  is -- is that pretty much the same, just typed up?

15     A    That was just an interim bill that I did

16  back in March, so whatever -- I've had some extra

17  time since then.

18     Q    Okay.  And that's reflected here for --

19     A    On the side.

20     Q    -- 2009?

21     A    Yes.

22     Q    One of the things I noticed is, first off,

23  your report is dated August 18th of last year, 2008;

24  correct?

25     A    Yes.

10

1     Q     And then at the end of your report, I

2     think you say that, "I will need to supplement my

3     opinions to finalize my conclusions once I've had

4     the opportunity to complete my analysis;" correct?

5     A     Right.

6     Q     Have you supplemented your report in any

7     way?

8     A     No.

9     Q     Has anyone asked you to supplement your

10    report in any way?

11    A     No.  We talked about it and, I guess,

12    decided that I would just -- nothing's changed that

13    drastically, so I would just, you know, give you the

14    rest of it today in my deposition.

15    Q     All right.  So at least back in August you

16    thought you might need to supplement your opinions

17    to finalize your conclusions, but since then you've

18    decide that you don't need to do that?

19    A     Well, with respect to the 78 claim files,

20    I would -- at that time I believe they were asking

21    for some additional file material and I don't think

22    we knew at the time what they were going to get, so

23    I was leaving it open for that.

24    Q     All right.  So, again, at least back in

25    August of 2008 you said that you would need to

1    supplement your opinions to finalize your

2    conclusions --

3         A    There we go.

4         Q    -- that last sentence.

5         A    Yes, I believe I was -- I would have to

6    supplement.  I thought they were getting more --

7    yeah, there was an additional request for the number

8    of all theft losses versus total losses.

9         Q    Okay.

10        A    So...

11        Q    And let me ask the question --

12        A    Okay.

13        Q    -- then I'll ask you about that.  At least

14   back in August of '08 you stated, "I will need to

15   supplement my opinions to finalize my conclusions

16   once I have had the opportunity to complete my

17   analysis," true?

18        A    Yes.

19        Q    And I understand what you're saying,

20   you're talking about, in the event they got

21   something new or extra that you had not already been

22   provided?

23        A    That's what I was thinking back then, yes.

24        Q    Now, have you received anything new since

25   you did your report in August of 2008?

12

1      A     I believe there were some more depositions

2  that were taken.   I think I've looked at Brooke

3  Garza's job description since then, and I can't

4  think of anything else.

5      Q     All right.   Looking at your typed up time

6  sheet for 2009, it has, "January 14th, review

7  depositions for two hours."   Do you recall what

8  depositions you reviewed?

9      A     No, not specifically.

10      Q     And then again on March 3rd of 2009 it

11  says, "Review depositions for three and a half

12  hours."   Do you recall what depositions you

13  reviewed?

14      A     Oh, they would be whichever ones aren't

15  listed here.   I think it was Damian Jordan and I

16  didn't review -- hadn't reviewed Rifken's

17  deposition.   I can't -- oh, there was the tow truck

18  driver, I don't remember all their names, the

19  independent adjustor down there in Texas, Garcia, I

20  think, was his name -- no, Gustavoes -- I'm getting

21  them confused -- the Gus person.   I think that's it.

22      Q     All right.   So the depositions that you've

23  reviewed in January and March of this year, '09,

24  would have been Jordan, the tow truck driver, and

25  the independent adjustor who you called "Gus"?

14

1        A      Right.

2        Q      And then another October 19th, yesterday,

3   of depo prep and review; correct?

4        A      Correct.

5        Q      And so you met on October the 6th, it

6   appears, for five hours and then again yesterday for

7   another five hours?

8        A      Correct.

9        Q      Who did you meet with on October the 6th

10  for five hours?

11       A      Mr. Proctor, Mr. Goolsby, and I think

12  Jeremy was in there, too, for -- for a while.

13       Q      All right.  And so you met with three of

14  the attorneys representing the plaintiff; correct?

15       A      Right.

16       Q      And what did y'all discuss for five hours

17  on October the 6th?

18       A      We just went through everything again, I

19  needed to get up to speed on it again, it had been a

20  while since I looked at it, and just really went

21  through it from start to finish and went over the

22  summary of the 78 opinion -- 78 files -- sorry --

23  depositions, those kinds of things, just really a

24  refresher of everything that had gone on up until

25  then.

15

1      Q    All right.  Other than refreshing your

2   recollection and the summary of the 78 files,

3   anything else that you can recall that you did for

4   five hours on October the 6th?

5      A    No.

6      Q    You said the summary of the 78 files, what

7   is that?

8      A    Just a chart that we put together to kind

9   of condense all of the information into something

10  that we could get our heads around and...

11     Q    So there's these 78 files, and you, along

12  with the attorneys for the plaintiff, put together a

13  chart summarizing the 78 files?

14     A    We did, yeah, like categories, and then as

15  we looked at the files, then we would, you know,

16  write in what the -- what each category applied, or

17  what was in that category from the file, and then at

18  the end they typed up the summary.

19     Q    All right.  And were you given a copy of

20  the summary?

21     A    Yes.

22     Q    And is that in the box --

23     A    Yes.

24     Q    -- that's upstairs?

25     A    Yes.

1   pick up things?

2        A    And probably just visit with them about

3   what their -- what they believe their case was about

4   and...

5        Q    The attorneys?

6        A    Yes.

7        Q    And then you also met with them on August

8   the 5th for two hours?

9        A    Is that what it says?  I can't read it

10  upside down.  Yes, it appears.

11       Q    And that was here at this office as well?

12       A    Yeah.  All of the meetings were here

13  pretty much.

14       Q    And who did you meet with on August the

15  5th for two hours?

16       A    I'm not sure.  It would have likely been

17  Mr. Proctor, Mr. Goolsby, or Mr. Gibbs, or all of --

18  three of them at various points in time.  I don't

19  remember exactly who it was with.

20       Q    All right.  Then on August the 15th

21  there's another meeting, "Reviewed claim files for

22  three hours," that would also be here at this

23  office?

24       A    Right, those were the 78 files.

25       Q    All right.  And so let me see if I can add

61

1    opinions.

2         A    I know, so --

3         Q    At least --

4         A    -- if you're not going to ask me anything

5    else, then I'm probably not going to have anything

6    else to say, we can leave.

7         Q    Well, my question's a little different.

8    As we sit here right now, you understand that you're

9    required to disclose all of your opinions --

10        A    Yes.

11        Q    -- in your report?

12        A    I do that.

13        Q    And as we sit here right now, is it your

14   testimony that you did disclose all of your opinions

15   in your report of August 18th, 2008?

16        A    Well, with a couple of exceptions.   I

17   wanted to make a correction on a date in there, and

18   do you want that now or --

19        Q    I do, sure.

20        A    Okay.   The date, on page four, paragraph

21   one, two, three, where I said September 15th, 2006.

22        Q    Is that --

23        A    I'm sorry.   Go ahead.

24        Q    That's the date that is what?

25        A    "Had Unitrin completed a fair, timely, and

63

1    "Why did I put September 15th, '06 in my report," is

2    there any other reason why you want to change it to

3    January 15th of '07?

4         A    Well, the reason that I selected the

5    January 15th date was because that would be about 60

6    days after Teague Body Shop received the vehicle and

7    I think that that would be plenty of time for

8    Unitrin to iron out any of the discrepancies with

9    respect to the damages, you know, have the engine

10   checked, all of that, and even if they felt that

11   they needed to get a follow-up statement from

12   Willie, that that would give them plenty of time.

13   It really should have been more than enough time for

14   them to do everything that they needed to do.

15        Q    All right.  Let me ask my question again,

16   because you've now told me about a correction you

17   would like to make in your report.  Any other

18   corrections that you would like to make in the

19   report?

20        A    No.

21        Q    All right.  And so I'm going to ask you

22   again, does the report, with that correction to

23   January 15th of '07, contain all of your opinions in

24   this case as we sit here today?

25        A    With the exception of my final, I guess

64

1 tally, of the 78 files, some of the trends that I

2 saw, and I wanted to give you those numbers

3 specifically.

4      Q    All right.  So that's a different, or

5 maybe not different, but a supplemental opinion?

6      A    Right.

7      Q    And when did you come -- first come to

8 this supplemental opinion?

9      A    When I counted on the sheet, just the

10 categories, it would have been, probably, the last

11 meeting that we had.  Excuse me.  A few day -- last

12 week, two weeks ago, whenever it was.

13      Q    October the 6th?

14      A    Yes.

15      Q    The last meeting --

16      A    Then that would be it.

17      Q    -- was October 6th.

18      A    Right.

19      Q    All right.

20      A    Correct.

21      Q    So you first came to this opinion that you

22 would like to supplement on October the 6th?

23      A    Yes.

24      Q    And what opinion is it?

25      A    Well, I'll just give you a couple of

65

1  things that I -- or three things that I developed

2  from going through those -- the chart, I guess, and

3  counting, and that 50 of the 78 files did not have

4  the proper referral criteria consistent with -- you

5  know, either there was no form, or it wasn't filled

6  out properly, or it didn't have the two or more

7  indicators.

8       Q    What else?

9       A    That on average they're in SIU for 70

10  days.  Of the 78 files, on average they're in SIU 70

11  days.  And the last is the average days that a claim

12  stays open when it's in SIU is 220 days.

13       Q    Anything else as far as your supplemental

14  opinions?

15       A    Well, just following up on these numbers,

16  that in, you know, two-thirds of the files they're

17  not even in step with their own criteria with

18  respect to the referrals being in SIU for 70 days on

19  average, that's over two months, which, of course,

20  my experience is they typically don't get paid while

21  they're in SIU, it's once the SIU has made a final

22  determination, then they accept or reject, approve

23  the loss, pay the claim, so that's the delay in

24  cases where there is no fraud, or potential fraud,

25  especially if they're not referred timely.

1          And then the average days that a claim

2     stays open, which I thought was very significant, is

3     nearly six months, 220 days, that's over six months,

4     and that's a long time for a claim to be -- it

5     doesn't take that long to figure out whether you're

6     going to pay a claim or not, even if you think

7     they're committing fraud, it just doesn't take that

8     long.

9          Q     All right.  Anything else as far as a

10    supplemental opinion?

11         A     No, that's it.

12         Q     Now, let me ask you this, are you aware of

13    any studies or statistics as to the average amount

14    of time a claim in the industry stays in SIU?

15         A     No, I'm not aware of any statistics.

16         Q     So whether 70 days is above normal,

17    normal, or below normal, you do not know?

18         A     I don't have a statistic about the

19    industry.  I have my experience and that's what I

20    would be testifying based on.

21         Q     Well, how oft -- how long did a claim stay

22    in SIU at St. Paul when it was referred, do you

23    know?

24         A     Well, if it was a legitimate referral and

25    we were doing a complete investigation, requesting

70

1          MR. PROCTOR:  Can we take a little break?

2          MR. WALTERS:  Oh, sure.

3          THE WITNESS:  It's 11:15 already?

4          THE VIDEOGRAPHER:  This is the end of tape

5  one of the videotaped deposition of Diane Luther.

6  The time is approximately 11:16 a.m. and we are now

7  going off the record.

8          (Break taken from 11:16 a.m. to 11:25

9  a.m.)

10         THE VIDEOGRAPHER:  We are now going back

11  on the record.  The time is approximately 11:25 a.m.

12     Q   (BY MR. WALTERS) Ms. Luther, I wanted to

13  follow up.  I asked you about your supplemental

14  opinions and this chart, and as I understand it, you

15  testified that you came up with these opinions on

16  October the 6th of this year; correct?

17     A   The supplemental and the chart thing?

18     Q   Yes, ma'am.

19     A   Yeah, I did, I counted them.

20     Q   And who prepared that chart?

21     A   It was a cooperative effort by myself, and

22  Mr. Gibbs, Goolsby, and Mr. Proctor, and maybe --

23  what's Jeremy's last name?  I'm drawing a blank.

24         MR. PROCTOR:  Carter.

25         THE WITNESS:  Carter.  Thank you.  Mr.

71

1    Carter, and then their legal assistant, I guess,

2    typed it.

3         Q     (BY MR. WALTERS) So it was a cooperative

4    effort between you and four of the attorneys

5    representing the plaintiff?

6         A     Yeah, we just sat in a big room and went

7    through the files and passed them around and looked

8    at the different things and...

9         Q     Let me ask you again, so it was a

10   cooperative effort of you and four of the attorneys

11   representing the plaintiff?

12        A     Proctor, Goolsby.  Probably, yes.  I don't

13   know if there was anyone else involved when I wasn't

14   around, but...

15        Q     Now, when you did your report back in

16   August of 2008 you indicate that those 78 files were

17   available to you back then.

18        A     Right.

19        Q     Is there any reason why you didn't come up

20   with any supplemental opinion until October the 6th

21   of this year?

22        A     I don't know that I had the chart.  Let me

23   look here, because I thought I billed for reviewing

24   those files in August.  I don't know -- I don't

25   think anything changed.  I was waiting on -- I'm

75

1    A    I don't know what my schedule was like

2  back in August of 2008.

3    Q    Other than your schedule.

4    A    Other than what I have here and my

5  schedule, I don't know of anything else, no.

6    Q    All right.  I'll add that in there.

7    A    Okay.

8    Q    Other than the thought you might get some

9  additional files and your schedule, is there any

10 other reason why you couldn't have done this

11 analysis and come up with a chart over a year ago?

12    A    Well, I think I would have needed a little

13 bit more time to look at it, but I don't know.  I

14 mean, I wasn't waiting for a year on anything, so I

15 don't...

16    Q    I think your answer -- I lost my question

17 in your answer, can I --

18    A    Well, I'm --

19    Q    -- try it again?

20    A    Yeah, try it again.

21    Q    All right.

22    A    Because I don't...

23    Q    Is there any reason that you know of,

24 sitting here today under oath, that you can tell the

25 judge why this analysis could not have been done

76

1    over a year ago?

2             MR. PROCTOR:  I'm going to object to the

3    form.

4             THE WITNESS:  Other than what I've already

5    testified to, I don't know of anything else.

6        Q    (BY MR. WALTERS) And the things you've

7    testified to would be your schedule and the thought

8    that you might get some extra information; correct?

9        A    And I want -- yes --

10       Q    Anything else?

11       A    -- to look at it.  No, I don't know of

12   anything else.

13       Q    I noticed in looking at your report that

14   you do not make any comment as it relates to anyone

15   at Unitrin's state of mind, is that fair?

16       A    Right.

17       Q    You are not here testifying as to anyone's

18   state of mind at Unitrin; correct?

19       A    That's correct.

20       Q    You're not here testifying that anyone at

21   Unitrin was acting with conscious indifference to

22   Mr. Morgan; correct?

23       A    Correct.

24            MR. PROCTOR:  Object to the form.

25       Q    (BY MR. WALTERS) You are not here